IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Gena Damron, | : | Case No. 1:08-CV-257 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING |
| | : | DEFENDANTS' MOTION FOR |
| Butler County Children's | : | SUMMARY JUDGMENT |
| Services, et al., | : | |
| | : | |
| Defendants. | : | |

This matter is before the Court on Defendants' Motion for Summary Judgment and

Memorandum in Support (hereinafter "Motion for Summary Judgment"). (Doc. 24.) Plaintiff

Gena Damron brought this action against her current employer, Butler County Children's

Services, Butler County Department of Job and Family Services, and Butler County Board of

Commissioners. (See First Amended Complaint, doc. 8.) Damron also sues a number of

individuals employed by Butler County Children's Services: Defendants Judy Stadler and Jann

Heffner, and Donna Lang are sued in their official and individual capacities, and Defendants Jeff

Centers and Tom Nowel are sued in their official capacities only. (Id.) Finally, Plaintiff also

names as Defendants "John Does and Jane Does 1-8" and "ABC Companies/Corporations 1-8."

(Id.)

Though Plaintiff's First Amended Complaint is unclear at points, the Court construes the

following claims: (1) gender discrimination under Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e, and under Chapter 4112 of the Ohio Rev. Code, (2) disability

1

discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and Ohio Rev. Code §§ 4112.02 and 4112.99,[1] (3) disability and gender discrimination under 42 U.S.C. § 1983 in violation of the Equal Protection Clause of the Fourteenth Amendment, (4) retaliation in violation of Ohio Rev. Code § 4112.02, (5) intentional infliction of emotional distress under Ohio law, (6) negligent infliction of emotional distress under Ohio law, and (7) failure to provide a violent free workplace in violation of Ohio Rev. Code § 4167.04. (See doc. 8.) Defendants move for summary judgment as to of all of Plaintiff's claims. (Doc. 24.) For the reasons that follow, the Court **GRANTS** Defendants' Motion for Summary Judgment.

I.     **BACKGROUND**

As an initial matter, the Court notes that the statement of facts that Plaintiff provided in her Response in Opposition to Defendant's Motion for Summary Judgment (hereinafter "response brief") is at points misleading and lacking in evidentiary support.[2] Defendants dedicated almost five pages of their reply memorandum to addressing a number of those misrepresentations. To the extent that Plaintiff mischaracterized testimony or made unsupported allegations, this Court will not repeat those allegations herein. Rather, the Court bases this statement of facts on (1) the evidentiary record and (2) Defendants' Notice of Proposed

---

[1] The Court notes that Plaintiff's state law disability discrimination claim appears in Count IV of Plaintiff's First Amended Complaint, wherein Plaintiff purports to bring a claim of "Disability Discrimination" under Ohio Rev. Code §§ 4112.02, 4112.14, and 4112.99. However, § 4112.14 pertains to age discrimination rather than to disability discrimination. Accordingly, the Court construes Count IV as stating a claim under Ohio Rev. Code §§ 4112.02 and 4112.99 but not under § 4112.14. (See doc. 8, Count IV.)

[2] In some cases, Plaintiff cites to evidentiary materials, such as portions of her own deposition transcript, that Plaintiff never actually filed or provided to the Court.

Undisputed Facts (doc. 25) to the extent any proposed facts are admitted by Plaintiff in

Plaintiff's Response to Defendants' Notice of Proposed Undisputed Facts (doc. 36).[3]

Damron[4] began working for Defendant Butler County Children Services (hereinafter

"BCCS") in February 2000 as a Social Worker 2 in the Ongoing Department. (Damron Dep.

7:8-14, 13:19-14:14.)   In that position, Damron worked with a caseload of families who needed

continued involvement and was responsible for conducting monthly home visits and helping

families obtain services such as counseling, substance abuse treatment, visitation, and parenting

classes. (Id. at 14:1-15:22.) Approximately one year after beginning employment, Plaintiff was

promoted to Social Worker 3 and received a pay raise although her duties remained the same.

(Id. at 17:10-23.) Plaintiff worked in the Ongoing Department for approximately four and a half

years. (Id. at 16:14-17.)

In mid-2004, Plaintiff applied for and was granted a transfer to a Social Worker 3

position in the Intake Department. (Damron Dep. 18:2-8, 21:19-22:6.) The Intake Department

handles initial referrals regarding child welfare concerns. (Id. at 18:9-23.) After a referral is

made, the case is assigned to an Intake Department social worker, who then conducts an

investigation by going to the home of family to interview the accused and the children and to

inspect the home for evidence of abuse and neglect. (Id.) Such investigations, which require the

---

[3] The Court notes that in responding to several of Defendants' proposed undisputed facts, Plaintiff gave no explanation for her denials and did not cite to any portion of the factual record. To the extent that Defendants provide support for their factual assertions and Plaintiff failed to support her denials, the Court accepts Defendants proposed facts as uncontested.

[4] The Court refers to the Plaintiff herein as "Damron" or "Gena Damron,"though there is evidence in the record that she also goes by the names "Gena Damron Bowels" or "Gena Bowels." (See, e.g., Redding Dep. 6:8-12, Ex. 8; Damron Dep. 142:8-16.)

social worker to work outside of the office in the community are sometimes referred to as "field work" or as "going out into the field." (See, e.g., id. at 24:11-23.) Based on the results of the investigation, the social worker either closes the case or transfers it to a different department for additional services. (Id. at 18:11-14.)

Damron was pregnant at the time she transferred to the Intake Department in 2004 and went on maternity leave less than a year after taking that position. (Damron Dep. 20:12-24.) When she returned from maternity leave, Damron took a part-time position in the Intake Department. (Id. at 20:25-22:24.) At some point prior to taking maternity leave, Damron advanced to the status of Social Worker 4 and the part-time position she took upon returning from leave was also a Social Worker 4 position. (Id. at 27:12-29:11) In approximately December of 2005, Damron decided to return to work as a full-time social worker in a "floater" position. (Id. at 26:2-13, 29:7-11.) At that time, Damron reported to Intake Supervisor Julie Redding. (Id. at 23:3-25:22, 27:3-9.) Floaters typically move back and forth between the Adoption, Intake, and Ongoing Departments. (Id. at 27:17-25.) Damron, however, spent her entire time as a floater in the Intake Department. (Id.)

On March 9, 2006, while pregnant with her second child, Plaintiff was assigned to go into the field to investigate Margaret Moore for a non-emergency report of child neglect. (Doc. 25 ¶ 1; doc. 36 ¶ 1.) According to Damron, the allegations against Moore were that she "left her daughter home alone for a period of time" and was "acting bizarre." (Doc. 25 ¶ 2; doc. 36 ¶ 2.) The intake report indicated that the person who made the allegations claimed that Moore was bi-polar and had stopped taking her medication. (Id.) Prior to going to Moore's residence, Damron reviewed the intake report and records of BCCS's previous investigation into Moore.

4

(Damron Dep. 54:10-21.) Damron was concerned about her own safety due to the allegations that Moore suffered mental illness and was acting in a bizarre manner.[5] (Id. at 55:2-15.) Damron checked Moore's criminal history on the Hamilton County Municipal Court website and discovered that Moore had two previous assault charges. (Id. at 194:9-20.) Damron did not remember talking to her supervisors about Moore's history and there is no evidence that Damron told anyone about the assault charges prior to going to Moore's residence. (See id.)

Damron did not ask that anyone accompany her on the investigation, but she took her cell phone with her. (Damron Dep. 57:1-8.) When Damron arrived at Moore's residence, Moore assaulted her.[6] (Doc. 25 ¶ 4; doc. 36 ¶4.) Once Damron was able to break away, she used her BCCS-issued cell phone to call the police. (Id.; Damron Dep. 59:7-16.) After the police arrived and arrested Moore, Damron called Redding and a co-worker, Karen Minehardt, both of whom then reported to the scene. (Damron Dep. 59:17-60:23.) Damron went to the hospital, where doctors examined her scrapes and bruises, ran some tests, and determined that her unborn child

_____

[5] Plaintiff states in her affidavit that "[n]oone from BCCS did a background check or informed me that Ms. Moore[sic] case was a 'high risk situation.'" (Damron Aff. ¶ 2, doc. 31-1.) However, there is no evidence that background checks were required or routinely performed. Plaintiff similarly cites no evidence that Moore's case actually was considered "high risk." According to Redding, about one-third of the allegations received by the Intake Department assert that the offender has some kind of mental health issue such as bi-polar disorder. (Redding Dep. 71:10-74.) Allegations of mental illness alone, without further corroboration or some evidence that the individual is a threat to his or herself or to someone else, do not elevate the case to a "high risk" designation. (Id. at 72:21-73:15.) Generally, when allegations of mental illness are made, the social worker in charge of investigating the case would also investigate those allegations. (Id.) During her deposition, Redding estimated, based on thirty years of experience in this area, that half of those allegations are not substantiated by the social workers. (Id.)

[6] During the attack, Moore held Damron down on the floor of Moore's balcony and threatened to kill Damron. (Redding Dep. Ex. 16; Damron Dep. 58:6-59:6.)

5

was fine.  (Id. at 61:1-22.)  While at the hospital, Damron filled out a form for, and later received, workers compensation benefits.  (Id. at 61:23-62:10.)

Following the Moore incident, the newly hired Director of Intake at BCCS, Defendant Judy Stadler, called Damron and told her to take as much time as she needed to recover. (Damron Dep. 96:1-15.)  Damron was not required to submit any medical documentation to Defendants at that time.  (Id. at 94:8-16.)  Damron remained on administrative leave for a month and a half after the assault, was paid her regular salary the entire time, and did not have to use any accrued leave.  (Id. at 62:11-17, 86:8-13, 94:2-7.)  Damron claims that her return to work in May 2006 was preemptive and that she felt pressure to return to work because Defendants Stadler and Human Resources Director Tom Nowel[7] called her a few times while she was on leave to inquire into when she thought she might be able to return to work.  (Id. at 95:13-98:9.) However, no one told Damron that she had to return by a certain date or lose her job.  (Id. at 98:10-99:5.)

At some point while Damron was on administrative leave, she met with Defendants Stadler and Nowel regarding her return to work.  (Damron Dep. 100:11-101:9.)  Damron advised them that she did not feel comfortable doing any field work because of the assault and requested to be placed in an in-house position.  (Id. at 100:23-101:8.)  When Damron returned to work in May 2006, Defendants accommodated her request and temporarily placed her in a training department position until she took leave for the birth of her second child in July 2006.  (Id. at 29:16-30:9.)  While in that position, Damron worked under the direction of Julie Kenniston

_____

[7] Nowel was employed as the Human Resources Director for BCCS from September 2000 to December 31, 2008.  (Nowel Dep. 5:3-11.)

doing research projects and assisting with the training and orientation of new employees.  (Id. at

29:16-30:9, 94:23-95:12.)

Damron claims in her First Amended Complaint and in her affidavit that "[u]pon [her]

return to work, [she] was met with retaliation and duress from her[sic] supervisors."  (Doc. 8 ¶

23; Damron Aff. ¶ 5.)  When asked about that allegation during her deposition, Damron

responded as follows:

> When I first came back in May, I started hearing the things that [BCCS Assistant
> Director] Donna Saunders[8] was supposedly saying about me and the way she
> acted towards me.  She would give me dirty looks. . . . If I was, you know, in
> Julie's[sic] Kenniston's office when Donna stopped by, she wouldn't look at me.
> She wouldn't talk to me.  She wouldn't acknowledge me.  It was those types of
> things.  Then after I came back from maternity leave, I felt that from Donna Lang,
> Judy Stadler, Donna Saunders.  You know, it was just like a – like a general anger
> towards me that I wasn't just jumping right back in and doing what I was – you
> know, the field work, take the cases that they had given me to do.

(Damron Dep. 106:5-19.)  When asked if she remembered anything specific that happened,

Damron said that there was one incident when Donna Saunders saw her taking a break and

talking to Julie Kenniston and said "shouldn't you be working" and told her to get back to work.[9]

(Id. at 106:23-107:4.)

Upon her return from maternity leave in October 2006, Damron was placed in a floater

position in the Ongoing Department, headed by Defendant Donna Lang.  (Id. at 30:10-20; Lang

---

[8] Donna Saunders was the assistant Director of BCCS at the time.  (Stadler Dep. 35:1-6.)

[9] Damron also claims that "[s]upervisors would take notes about their dealings with
Plaintiff due to the inherent uneasiness her presence brought to the workplace."  (Doc. 31 at 7
(citing Redding Dep. 25-28, Exs. 10-13).)  However, the evidence Damron cites to support that
claim includes: (a) notes that Redding took in preparation of defending the claims originally
brought against her in this lawsuit (see doc. 3; Redding Dep. Ex. 10); and (b) notes that Redding
took about issues related to her own employment with BCCS that appear to have nothing to do
with Damron (see Redding Dep. Exs. 11-13.)  The Court thus finds the claim unfounded and
notes that this is one example of the type of misrepresentations the Court addressed above.

Dep. 17:16-18:15.)  The position initially involved some field work, but Damron was always accompanied by another employee when working in the field.  (Damron Dep. 35:3-13.)  After two weeks, Damron told her immediate supervisor, Jennifer Rohrer, that she did not believe she could handle the stress of the field work.  (Id. at 31:10-21.)

In or around that time, Damron applied for two Social Services Supervisor positions.  (Damron Dep. at 135:19-36:18, Ex. 5.)  Damron testified that she believed the positions were awarded to Mike Brock or Alicia Rolland, both of whom were Damron's coworkers at the time.  (Id. at 137:4-13.)  Damron also testified that she believed she was more qualified than either Brock or Rolland because she had been at the agency longer and had more experience.  (Id. at 137:14-138:10.)  When asked if there was any other reason why she felt she was more qualified for a supervisor position than Brock, Damron stated, "No.  I mean, I don't know what kind of work he did.  I mean, I always did really good work so I would always, of course, think I did a better job than the next person."  (Id. at 137:23-138:2.)  When Damron talked to her supervisors about the hiring selections, she was told that one of the reasons she was not selected for the supervisor positions was that she did not yet have her master's degree.  (Id. at 138:16-141:19.)

In late October 2006, Damron consulted her family physician, Dr. Rick Bucher, about the stress she was experiencing at work.  (Damron Dep. 33:8-19.)  Dr. Bucher diagnosed Damron with Post Traumatic Stress Disorder and gave her a note stating in relevant part as follows:

> This is a letter to inform Gena Damron's employer that she is unable to return to "the field",[sic] by calling on homes with children at risk due to her current medical problems.  She has not recovered from the life threatening experience she suffered while working this past year and is being treated for Post Traumatic Stress Disorder.  This could be a permanent lifelong disability, but she does have the potential for recovery.  It is not known what time period may be required to recover.  She is capable of performing field work by visiting foster care homes or office work.

(Defs.' Mot. Summ. J. Ex. 7, doc. 24-9 (emphasis added).)  After Damron gave the note to Nowel, Damron stayed in the floater position but her field work was restricted to visiting foster and kinship homes.  (Damron Dep. 34:8-22, 37:4-24; doc. 25 ¶ 9; doc. 36 ¶ 9.)  At first Damron thought she would be able to handle those visits, but she had a few experiences, such as getting "stuck in traffic in a bad neighborhood" and being approached by someone outside of one of the foster homes, that made her uncomfortable.  (Damron Dep. 39:2-40:5, 225:11-24.)  Damron discussed her concerns with her supervisors, Rohrer and Lang.  (Id. at 226:10-16.)  According to Damron, Rohrer was supportive of Damron doing work with which she felt comfortable, but Lang "was not so open to that, [and] made comments that, you know, if [she]couldn't do [her] job, perhaps [she] needed to find something else to do and that [Lang] felt they had made enough accommodations for [her]."  (Id. at 226:19-24.)

After obtaining the note from Dr. Bucher, Damron continued to visit foster homes for about two months.  Because Dr. Bucher's note stated that Damron's impairment could be permanent and because Dr. Bucher was a general practitioner and not a psychiatrist, Nowel ordered Damron to undergo a fitness-for-duty evaluation with Dr. Gail Hellmann, a licensed psychiatrist.  (Nowel Dep. 68:7-72:23; Damron Dep. 41:14-18.)  On or about December 18, 2006, after evaluating Damron, Dr. Hellmann sent a letter to Nowel recommending that Damron perform absolutely no field work at all due to her Post Traumatic Stress Disorder (hereinafter "PTSD").  (Defs.' Mot. Summ. J. Ex. 8, doc. 24-10 at 7.)  Based on Dr. Hellmann's report, Nowel further restricted Damron from doing any field work, including foster visits, as of January 2007.  (Damron Dep. 41:12-42:7.)

Damron was then placed into a temporary screener position in Defendant Stadler's Intake Department for six to eight months. (Doc. 25 ¶ 11; doc. 36 ¶ 11.) During that time, Damron answered phones and took initial reports of neglect or abuse and decided whether to assign the case to a case worker or "screen it out." (Id.; Damron Dep. 42:18-43:22.) The position did not involve any field work. (Doc. 25 ¶ 11; doc. 36 ¶ 11; Damron Dep. 42:18-43:22.) Damron felt the work was meaningful and did not experience the kind of problems she had faced earlier when doing field work. (Damron Dep. 43:11-19.) However, during this time, Damron's immediate supervisor, Sandy Roseman, advised Defendant Stadler that she "had concerns about [Damron's] judgment and decision making in terms of the cases being screened in and screened out." (Stadler Dep. 65:6-16.) Roseman also expressed concern that Damron was not learning from her direction, noting that she previously on multiple occasions had discussed particular screening decisions with Damron. (Id.) Stadler advised Roseman to discuss the problems with Damron and continue to try to help her understand the screening process. (Id. at 65:23-66:3.) However, Roseman continued to report that Damron was making questionable screening decisions and was not learning from Roseman's directions. (Id. at 69:2-17.)

In May 2007, Damron applied but was not selected for a full time screener position. Damron Dep. 142:8-24.) The position was instead awarded to Katrina Shahan, one of Damron's coworkers. (Id. at 143:11-23.) Damron felt she was more qualified for the position because she had worked for BCCS longer and was in the process of getting her master's degree. (Id.) Damron filed a grievance through her union representative, Tom Brannigan. (Nowel Dep. 87:4-19, Exs. 7, 26; Damron Dep. 142:8-25, Ex. 7.) Damron's sole allegation in her grievance was that "[a] coworker with less experience and seniority was awarded the position . . .." (Damron

Dep. Ex. 7.)  Damron's grievance was reviewed and denied by Nowel.[10]  (Nowel Dep. Ex. 26.)

The union representing Damron advised Nowel that they would not pursue mediation or

arbitration of the grievance because they did not feel the grievance had sufficient merit.  (Nowel

Dep. 89:5-17.)

BCCS then temporarily moved Damron into a Matching Coordinator position wherein

she helped find homes for children and performed no field work.  (Damron Dep. 44:4-45:17.)  In

June 2007, Damron applied for a Reviewer position.  (Id. at 148:5-17, Ex. 8.)  Damron did not

get the job, however, because BCCS decided not to fill the position.  (Id. at 151:11-152:5.)  Two

months later, in August 2007, Damron applied for an Investigative Resource Officer position but

did not realize that all applicants were required to possess a peace officer's certificate.  (Id. at

152:14-153:11.)  Damron did not have that certificate and therefore was not qualified for the

position.  (Id.)

In September of 2007, Plaintiff applied for two positions in Intake – Third-Shift Screener

Supervisor and Part-Time Screener Supervisor.  (Damron Dep. 153:14-154:9.)   The positions

involved the same duties and would have required Damron to supervise the same screener

positions in which Damron had difficulty making proper decisions.  (See Stadler Dep.

68:17-69:14; Damron Dep. Ex. 10.) The positions were ultimately awarded to Damron's

co-workers, Amy Miller and either Erin Vogel or Ellie Meisenbach.  (Damron Dep. 155:11-15.)

---

[10] The grievance procedure for BCCS employees was at that time structured as follows:
The first step was to file a written grievance with the employee's supervisor; the second step was
to send the grievance to the Human Resources Coordinator; and the third and final in-house step
was to send the grievance to the Executive Director.  (Nowel Dep. 88:4-15.)  During the time
period at issue in this case, Nowel handled all step-three grievances as a designee of the
Executive Director.  (Id.)  After exhausting all in-house steps, the employee could then seek
mediation and arbitration.  (Id. at 88:16-22.)

In October 2007, Damron applied for a supervisor position in the Ongoing Department. (Id. at 157:15-23.) The position was awarded to Tim Brannigan, another of Damron's coworkers. (Id. at 173:23-174:9.) Damron testified that she believes Brannigan is just as qualified for the ongoing supervisor position as she is. (Id. at 174:4-13.) Nonetheless, after BCCS chose Brannigan for the supervisor position, Damron brought the instant suit. In May 2008, shortly after Damron filed suit, BCCS moved her to a position in a newly created department, the "Criminal Investigation Unit," where she performs background checks and office work. (Id. at 47:3-18.) She is not required to perform any field work in that position. (Id. at 174:14-175:22.) However, Damron has considered trying to do field work again in the future. (Id.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. See Lujan v. National Wildlife Federation, 497 U.S. 871, 888-89 (1990). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts . . . earlier deposition testimony." Reid v. Sears Roebuck & Co., 790 F.2d 453, 460 (6th Cir. 1986) (citing Biechell v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir. 1984)).

In reviewing the evidence set forth by both the moving and non-moving parties, the Court must carefully review "those portions of the submitted evidence designated by" both parties. Guarino v. Brookfield Twp. Tr's., 980 F.2d 399, 410 (6th Cir. 1992). However, the Court will not "sua sponte comb the record from the partisan perspective of an advocate for the non-moving [or moving] party." Id. The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. A genuine issue for trial exists when the evidence is not "so one-sided that one party must prevail as a matter of law." Id. at 252.

## III.     ANALYSIS

As stated above, Damron brings claims for: (1) gender discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, and under Chapter 4112 of the Ohio Rev. Code, (2) disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and Ohio Rev. Code §§ 4112.02 and 4112.99, (3) disability and gender discrimination under 42 U.S.C. § 1983 in violation of the Equal Protection Clause of the Fourteenth Amendment, (4) retaliation in violation of Ohio Rev. Code § 4112.02, (5)

intentional infliction of emotional distress under Ohio law, (6) negligent infliction of emotional distress under Ohio law, and (7) failure to provide a violence free workplace in violation of Ohio Rev. Code § 4167.04.  (See doc. 8.)  In their Motion for Summary Judgment, Defendants argue that they are entitled to summary judgment as to all of Damron's claims, and that Defendants are entitled to state law immunity as to Damron's intentional and negligent infliction of emotional distress claims.  The Court analyzes each claim below, and for the reasons stated herein, the Court grants summary judgment to Defendants as to all of Damron's claims.

**A.     Federal Statutory Discrimination Claims: Title VII and ADA**

Defendants argue the Court should dismiss Damron's Title VII and ADA claims because Damron failed to timely exhaust her federal administrative remedies.  "Failure to timely exhaust administrative remedies is an appropriate basis for dismissal of a Title VII or ADA action." Williams v. Northwest Airlines, Inc., 53 F. App'x 350, 351 (6th Cir. 2002); see also Mayers v. Sedgwick Claims Management Services, Inc., 101 F. App'x 591, 593 (6th Cir. 2004); Abner v. General Motors, 103 F. App'x 563, 565 (6th Cir. 2004) (holding that the plaintiff's "claims under the ADA . . . were properly dismissed because he failed to file a charge with the EEOC within 300 days of his June 2000 discharge"); Brown v. Abbott Laboratories, 90 F. App'x 891, 892 (6th Cir. 2004) (dismissing Title VII claim due to the plaintiff's failure to exhaust administrative remedies); Amini v. Oberlin College, 259 F.3d 493, 498 (6th Cir. 2001) ("Plaintiffs must typically file a timely discrimination charge with the EEOC in order to bring a Title VII lawsuit."); Lowe v. Hamilton County Job & Family Services, No. 1:05cv117, 2009 WL 818960, at *7 (S.D. Ohio Mar. 27, 2009) ("The failure to timely exhaust available administrative remedies is an appropriate basis for dismissal of an ADA or Title VII action.").

To exhaust administrative remedies, a plaintiff must file a charge with the Equal Employment Opportunity Commission ("EEOC) within 180 days of the alleged unlawful employment practice or, if the plaintiff has instituted proceedings with a state or local agency, within 300 days.  See 42 U.S.C. § 2000e-5(e).  Once the EEOC dismisses the charge and issues a right-to-sue letter, the plaintiff has ninety days to file a civil action.  See 42 U.S.C. § 2000e-5(f)(1).  A plaintiff may not file a suit under Title VII or the ADA if he or she does not possess a right-to-sue letter from the EEOC because he or she has not exhausted his or her remedies.  See Parry v. Mohawk Motors of Michigan, Inc., 236 F.3d 299, 309 (6th Cir. 2000).  However, the failure to obtain a right-to-sue letter is not a jurisdictional defect.  Id.; see also Williams, 53 F. App'x at 351-52.  Rather, the right-to-sue letter is a condition precedent that is subject to waiver, estoppel, and equitable tolling.  See Zipes v. TWA, 455 U.S. 385, 393 (1982); Williams, 53 F. App'x at 351-52.

There is nothing in Damron's pleadings to suggest that she made any effort to exhaust administrative remedies.  During her deposition, she testified that she never filed a claim with the EEOC or with the Ohio Civil Rights Commission ("OCRC").  (Damron Dep. 216:15-20.)  In her response brief, Damron completely ignores Defendants' argument on this point.  She makes no argument for equitable tolling[11] nor describes any attempt to cure the defect.  The Court therefore finds that Damron's failure to exhaust administrative remedies warrants dismissal of her Title VII and ADA claims.

### B.    State Statutory Discrimination Claims: Ohio Revised Code Chapter 4112

---

[11] Federal courts apply equitable tolling sparingly. See Irwin v. Dep"t of Veterans Affairs, 498 U.S. 89, 96 (1990).  A plaintiff must demonstrate facts showing he or she acted with diligence in pursuing the claim.  Williams, 53 F. App'x at 352.

### 1.    Gender Discrimination Under Ohio Revised Code Chapter 4112

In Count II of her First Amended Complaint, Damron asserts a gender discrimination claim under Chapter 4112 of the Ohio Revised Code.  With regard to both her federal and state law gender discrimination claims, Damron alleges that Defendants deprived her of promotional opportunities, light duty assignments, and favorable work assignments because of her sex and gender.  (Doc. 8 ¶ 47.)  She further alleges that she suffered harassment and was forced to work in a hostile, abusive environment.  To the extent that Damron sought to bring a hostile work environment claim, she fails to support that claim with any evidence or to address that claim in any manner.  The Court therefore focuses on Damron's allegation that she was discriminated against in promotional and hiring decisions on the basis of her sex or gender.

In their Motion for Summary Judgment, Defendants argue that Damron fails to establish a prima facie case of gender discrimination and that the undisputed evidence demonstrates that gender did not play a role in any of the alleged employment decisions.  Damron does not respond to Defendant's arguments and with the exception of a short discussion of the case law applicable to disparate impact claims wherein she alleges that she was "treated . . . differently than her . . . male counterparts," does not address her gender discrimination claims at all.  (See doc. 31 at 23.)

Ohio Rev. Code § 4112.02 (A) provides in relevant part that "[i]t shall be an unlawful discriminatory practice: (A) For any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person."  The Supreme Court of Ohio has "determined that federal case law interpreting Title VII of the Civil Rights Act of 1964 . . . is generally applicable to cases involving alleged violations of [Ohio Rev. Code] Chapter 4112." Plumbers

& Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Commission, 66 Ohio St. 2d 192, 196, 421 N.E.2d 128, 131 (1981). Therefore, this Court may look to federal case law in addition to state law to resolve this matter.

When, as is the case here, a plaintiff presents only indirect evidence of discrimination, the court analyzes the claim under the McDonnell Douglas burden-shifting approach. See Clay v. United Parcel Serv., Inc., 501 F.3d 695, 703 (6th Cir. 2007); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, the plaintiff bears the initial burden to establish a prima facie case of discrimination. Id. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show a legitimate nondiscriminatory reason for the adverse employment action. Id. If the defendant meets this burden, the burden then shifts back to the plaintiff to show that the defendant's proffered rationale was merely pretext for unlawful discrimination. Id. at 704.

To establish a prima facie case of employment discrimination under the McDonnell Douglas framework, Damron must show that: (1) she is a member of a protected class; (2) she applied and was qualified for a promotion or job opportunity;[12] (3) she was considered for and denied the promotion or job opportunity; and (4) another similarly situated employee who was not a member of the protected class received the promotion or job opportunity. See Russel v.

---

[12] The general prima facie test for a Title VII case requires the employee to show that he or she suffered an adverse employment action. The Court adapted that test herein consistent with Damron's allegation that Defendants denied her promotional opportunities, light duty assignments, and favorable work assignments because of her sex. The denial of a promotional opportunity may constitute an adverse employment decision. See Russel v. Ohio, Dept. of Administrative Services, 302 F. App'x 386, 392 (6th Cir. 2008). With regard to the denial of work assignments, the Court assumes, because the parties did not address the issue and because the Court grants summary judgment on other grounds, that the denial of work assignments may also, under certain circumstances, constitute an adverse employment decision.

17

Ohio, Dept. of Administrative Services, 302 F. App'x 386, 392 (6th Cir. 2008)  (discussing the prima facie test for a failure to promote claim).  The evidence submitted to the Court shows that Damron, a female, applied for a number of positions within BCCS and that BCCS chose other employees to fill those positions.  Therefore, Damron sets forth sufficient evidence to meet the first and third prongs of the prima facie test.  However, Damron sets forth no evidence to satisfy the second and fourth prongs of the test.

Most of the positions to which Damron applied were awarded to female coworkers of Damron's.  The evidence shows that only two positions were awarded to male coworkers:  In 2006, Damron applied for a Social Services Supervisor position that ultimately was awarded to her coworker, Mike Brock.  The following year, in October 2007, Damron applied for a supervisor position in the Ongoing Department that was awarded to another of Damron's coworkers, Tim Brannigan.  With regard to those two positions, Damron can show that an employee who was not a member of the protected class was chosen for the job.  Damron points to no evidence, however, demonstrating that she was similarly situated to Brock or Brannigan or that she was qualified[13] for either of the supervisor positions.  See Russel, 302 F. App'x at 392 (finding that the plaintiff failed to state a prima facie case where she failed to show that she was similarly situated to the person who received the job she applied for and failed to demonstrate that she was qualified for the job.)

Moreover, the uncontroverted evidence demonstrates that Damron does not believe she was discriminated against on the on the basis of her sex.  Defendants point specifically to the following portion of Damron's deposition:

---

[13] In fact, Damron does not provide the job descriptions for the supervisor positions such that the Court could determine what the basic requirements were.

Q.  . . . You don't believe that there was any discrimination because of your sex or harassment because of your sex because you're a female, do you?

A.  No.

(Damron Dep. 216:21-217:1.)  Damron confirms the lack of evidence to support her gender discrimination claims by failing to make any argument in support of these claims in her response brief.  Defendants therefore are entitled to summary judgment as to Damron's Ohio law gender discrimination claim.

### 2.      Disability Discrimination Under Ohio Revised Code Chapter 4112

Damron next asserts a disability discrimination claim under Ohio Rev. Code §§ 4112.02 and 4112.99, based upon (1) Defendants' alleged failure to provide accommodations and (2) Defendant's failure to provide promotions and transfers to various positions within BCCS.  Like Damron's gender discrimination claims, her disability discrimination claims may be analyzed under analogous federal law, specifically, the standards applicable to ADA claims.[14]  See Martin

---

[14] The Court recognizes the "ADA Amendments Act of 2008" ("ADAA"), effective January 1, 2009, explicitly overruled major Supreme Court decisions construing the ADA and established that "the definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act."  P.L. 110-325 § 4(A), 122 Stat. 3553 (2008).  It is yet unclear whether federal caselaw applying the ADAA will also be applicable to the analysis of Ohio law disability discrimination claims or whether disability claims under Ohio law will continue to be analyzed using the pre-amendment standards.  In any case, the Court need not resolve that issue because the relevant events of this case took place before the ADAA went into effect and therefore must be resolved without regard to the amendments.  See Vaughn v. Rent-A-Center, Inc., No. 2:06- cv-1027, 2009 WL 723166, at *3 n. 1 (S.D. Ohio Mar. 16, 2009) ("These amendments do not apply retroactively, however, and this Court must decide this case without regard to those amendments, using the law in force at the time the complained of activity occurred." (citing Verhoff v. Time Warner Cable, Inc., Nos. 07-4265, 07-4348, 2008 WL 4691794, at *4 (6th Cir. Oct. 24, 2008)); see also EEOC v. Agro Distrib. LLC, 555 F.3d 462, 469 n. 8 (5th Cir. 2009) (2008 ADA Amendments do not apply retroactively); Geiger v. Pfizer, Inc., No. 2:06-CV-636, 2009 WL 973545, at *2 (S.D. Ohio April 10, 2009); Supinski v. United Parcel Serv., Inc., No. 3:cv-06-0793, 2009 WL 113796, at *5 n. 6 (M.D. Pa. Jan.16, 2009) (collecting cases) ("every court that has addressed the issue has concluded that the 2008 Amendments cannot be applied

v. Barnestille Exempted Vill. Sch. Dist. Bd. of Educ., 209 F.3d 931, 934 n. 2 (6th Cir. 2000) ("Both federal and Ohio disability discrimination actions require the same analysis.").

Defendants argue that Damron cannot establish a prima facie case of discrimination with regard to either theory. Damron responds first that she need not establish a prima facie case because she points to direct evidence of discrimination, thereby obviating the need to apply the McDonnell Douglas burden-shifting framework to her claim. In the alternative, Damron contends that she can establish a prima facie case using indirect evidence of discrimination.

### a.    Direct Evidence

In order to establish a disability discrimination claim, a plaintiff must produce either direct or circumstantial evidence of discrimination. DiCarlo v. Potter, 358 F.3d 408, 414 (6th Cir. 2004). Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 548 (6th Cir. 2004). In the section of Damron's response brief describing the alleged direct evidence, she makes broad allegations while citing to little if any evidence, let alone any direct evidence. Sorting through Plaintiff's various allegations, the Court finds that the only arguable "evidence" to which Damron refers includes: (1) notes that Redding made regarding Damron's performance following the assault (see Redding Dep. 25-28, Exs. 10-13); (2) statements allegedly made by Lang regarding Damron's inability to work in the field and "facial gestures intended to create harm and distress" (see doc. 31 at 13); (3) references allegedly made by Saunders regarding Damron's inability to work in the field due to her assault; and (4) comments in a May 19, 2009

---

retroactively to conduct that preceded its effective date")); Jones v. Wal-Mart Stores, East, L.P., No. 3:07-CV-461, 2009 WL 1588656, at * 3 n. 2 (E.D. Tenn. June 05, 2009).

letter from a psychiatrist, Dr. Douglas Mossman, that there was a "strained relationship" between Damron and BCCS and that Defendants were unable to collaborate on a plan that would determine whether Damron could tolerate field work (see id. at 13-14 (citing Damron Aff. Ex. 5)).

With regard to the alleged notes Redding took, the evidence Damron cites includes: (a) notes that Redding made in preparation of defending the claims originally brought against her in this lawsuit (see doc. 3; Redding Dep. Ex. 10), and (b) notes that Redding took about issues related to her own employment with BCCS that appear to have nothing to do with Damron. (See Redding Dep. Exs. 11-13.) The notes are at many points illegible, and Damron cites to nothing specific in the notes but rather claims that in general, they constitute direct evidence of discrimination. The Court, to the contrary, finds that due to the circumstances under which they were created, the notes either are irrelevant to this dispute or do not contain direct evidence of disability discrimination.[15]

The statements and "facial gestures" allegedly made by Lang and Saunders also are at best circumstantial evidence. The Court is unclear as to how facial gestures could ever constitute direct evidence of discrimination as they almost always require interpretation based on inference. Similarly, the alleged statements made by Lang and Saunders do not alone prove the existence of discrimination or discriminatory intent. Moreover, the only evidence of those comments to which Damron cites is her own deposition testimony and it is questionable whether the alleged

---

[15] As Defendants point out in their reply brief, Redding never supervised Damron after she returned to work following the Moore situation (Redding Dep. 15:11-16, 31:15-32:5) and none of Damron's supervisors spoke with Redding about Damron's performance after Damron's return (id. at 83:20-84:19). There is no evidence, in fact that Redding had any meaningful interaction with Damron during the period in which Damron claims she faced discrimination.

statements amount to inadmissible hearsay. For example, Damron testified that she "started hearing through people that there was discussion, specifically from Donna Saunders during a meeting that had happened where she thought that I was acting entitled, that I thought I could just come in and do whatever I wanted." (Damron Dep. 101:9-14.) That testimony comprises layers of hearsay and even if found to be admissible does not amount to direct evidence.

Finally, the comments made in Dr. Mossman's letter are based solely on his evaluation of Damron and a review of various documents relevant to Damron's claims. (See Damron Aff. Ex. 5.) Dr. Mossman was retained by Defendants as an expert in this case. He had never met Damron prior to the case and has no firsthand knowledge of Damron's work environment. His findings therefore do not constitute direct evidence of disability discrimination. Rather, they represent his understanding of Damron's work environment based on Damron's own report of her experiences.

### b. Circumstantial Evidence

Because Damron presented no direct evidence, she must make her case with indirect evidence under the McDonnell Douglas burden-shifting framework described above. The elements of the prima facie case that Damron must meet for her failure to accommodate claim[16] differs in part from those she must meet with regard to her denial of promotion and/or job

---

[16] In order to establish a prima facie case of disability discrimination under the ADA for failure to accommodate, Damron must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) her employer failed to provide the necessary accommodation. See DiCarlo v. Potter, 358 F.3d 408, 419 (6th Cir. 2004).

opportunity claim.[17]  The Court need not analyze those claims separately, however, as Damron

fails to set forth any evidence to satisfy the first element of both tests – that she is disabled

within the meaning of the ADA.

Determining whether a plaintiff is disabled requires an individualized, case-by-case

inquiry.  MX Group, Inc. v. City of Covington, 293 F.3d 326, 337 (6th Cir. 2002).  The ADA

defines "disability" as "(A) a physical or mental impairment that substantially limits one or more

major life activities of such individual; (B) a record of having such an impairment; or (c) being

regarded as having such an impairment."  42 U.S.C. § 12102(2).  Damron, apparently focusing

only on the first definition of disability, argues that she suffers from PTSD, major depressive

disorder, and obsessive compulsive disorder and that as a result, she is "substantially limited [in]

her ability to work, among other things."  (Doc. 31 at 16.)

The Supreme Court has set forth a three-step approach to determine whether a plaintiff

suffers from a physical or mental impairment that substantially limits one or more major life

activities of such individual:

> First, the Court considers whether a condition is an impairment; second, it
> identifies the life activity that the plaintiff relies upon and determines whether it
> constitutes a major life activity; and third, the Court asks whether the impairment
> substantially limits the major life activity.

Williams v. Stark County Bd. of County Comm'rs, 7 F. App'x 441, 445 (6th Cir. 2001) (citing

Bragdon v. Abbott, 524 U.S. 624, 630-31 (1998)).  For the purposes of this case, the Court

---

[17] To establish a prima facie case that she was denied certain job opportunities, including
lateral transfers and promotional opportunities, in violation of the ADA, Damron must show that:
(1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position,
with or without reasonable accommodation; (3) she suffered an adverse employment action; (4)
the employer knew or had reason to know of her disability; and (5) the position to which she
applied remained open or was awarded to a non-disabled employee.  See Hopkins v. Elec. Data
Sys. Corp., 196 F.3d 655, 660 (6th Cir. 1999).

assumes that PTSD, major depressive disorder, and obsessive compulsive disorder,[18] qualify as impairments under the ADA.  Courts have repeatedly held that merely having an impairment or medical diagnosis does not make a plaintiff disabled under the ADA.  <u>Toyota Motor Mfg., Ky., Inc. v. Williams</u>, 534 U.S. 184, 195 (2002); <u>MX Group, Inc.</u>, 293 F.3d at 337.   Damron must also show that one or more of the impairments substantially limits a major life activity.  <u>See</u> <u>id.</u>

Under the law applicable to this case, the term "substantially limits," like the term "major life activities," is construed narrowly.  <u>See</u> <u>Toyota Motor Mfg.</u>, 534 U.S. at 197 (emphasizing that the term "major life activities" should "be interpreted strictly to create a demanding standard for qualifying as disabled"); <u>Mahon v. Crowell</u>, 295 F.3d 585, 590 (2002).  "Substantially limits" means "unable to perform a major life activity that the average person in the general population can perform; or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity."  29 C.F.R. § 1630.2(j)(1).  Factors to be considered include "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment."  <u>Id.</u> at § 1630.2(j)(2).  Additionally, "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures – both positive and negative – must be taken into account when judging

---

[18] The Court notes that Damron relies on Dr. Mossman's May 19, 2009 report as evidence of her diagnosis.  (<u>See</u> Damron Aff. Ex. 5 at 16.)  Dr. Mossman's specific diagnosis as to Damron's depression is that she suffers from "Major Depressive Disorder, recurrent, in partial remission."  (<u>Id.</u>)

whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act." Sutton v. United Air Lines, Inc., 527 U.S. 471, 482 (1999).[19]

As stated above, Damron claims that impairment substantially limits her major life activity of work. She also alleges other unspecified major life activities are limited. There is no exhaustive list of major life activities under the ADA. However, at the time of the events that took place in this case, the Supreme Court had "cited with approval the regulations promulgated under the Rehabilitation Act defining major life activities to include 'functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" Mahon, 295 F.3d at 590 (quoting 45 C.F.R § 84.3(j)(2)(ii) and citing Toyota Motor Mfg., 534 U.S. at 195).

The only actual evidence that Damron points out to demonstrate the alleged substantial effects of her impairments include: (1) the recommendations of Drs. Bucher, Hellmann, and Mossman that Damron perform limited or no field work; (2) Dr. Bucher's opinion that Damron's PTSD "could be a permanent lifelong disability, but that she does have the potential for recovery," (see Damron Aff. Ex. 1); and (3) Damron's own testimony that she suffered from panic attacks while at work (see Damron Dep. 217-18). Damron describes the effects of her PTSD as follows: ". . . nervousness, shaking, nightmares, panic attacks, inability to – excuse me. My stomach. I mean, just a regular inability to appear calm, I guess. I don't know how else to

---

[19] The Court notes that Congress legislatively overturned Sutton in the ADAA and instructed that "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as ... hearing aids." ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553, 3556 (2008). However, as noted above, the ADAA is not retroactive and the Court applies pre-ADAA law to the instant case.

describe it. A lot of it just seems so internal." (Damron Dep. 217:24-218:3.) At the time of her July 10, 2009 deposition, Damron testified that she had not experienced a panic attack at work in the past six to eight months, and that in the last year she had only suffered three panic attacks in total, whether at work or elsewhere. (Damron Dep. 219:3-10; 221:8-11.) Damron currently takes Xanax as needed to alleviate her anxiety and testified that on average, she does not take Xanax more than once a month. (Damron Dep. 221:12-222:12.) Damron admits that, except with regard to her ability to perform field work, none of her symptoms affect her ability to work. (Damron Dep. 92:10-13.)

Considering the evidence presented by both Plaintiff and Defendants, the Court finds that no reasonable jury could find that Damron is substantially limited in her ability to work. The Court recognizes that Damron is limited in her ability to perform field work. However, she admits that her impairments do not otherwise affect her ability to work and she has continued to work for BCCS in a variety of positions. The United States Supreme Court has stated that:

> When the major life activity under consideration is that of working, the statutory phrase "substantially limits" requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs. . . . To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

Sutton, 527 U.S. at 491-92. To determine if Damron is precluded from a substantial class or broad range of jobs, the Court compares her access to jobs to the access available to a non-injured individual with similar training and experience, looking specifically to the labor market in Damron's geographic vicinity. Mahon, 295 F.3d at 591. Unfortunately, Damron presented no evidence from which the Court could begin to make such a comparison.

26

The Sixth Circuit "has in the past allowed claimants to assert they were substantially limited in the major life activity of working when they showed their impairments barred them from a significant percentage of available jobs." Id. at 591. However, Damron presents no concrete evidence in this case that her inability to do field work at this time precludes her from performing a certain percentage of available jobs. The little evidence that Damron points to shows, instead, that she is able to perform a number of different jobs in her field, as demonstrated by her ability to perform a number of different jobs at BCCS during the time that she has been precluded from performing field work. Damron continues to work for BCCS in a position that requires no field work. Finally, the Court finds that there is conflicting evidence as to whether Damron remains unable to perform field work. As Damron points out, she would be willing to try field work again and her physician, Dr. Bucher, stated in a February 26, 2009 letter that Damron "is capable of performing field work that is comfortable for her and at her discretion indefinitely." (Damron Aff. Ex. 3.)

Accordingly, the Court finds that Damron failed to set forth sufficient evidence to demonstrate a question of fact as to whether she is substantially limited in her ability to work. See McNeill v. Wayne County, 300 F. App'x 358, 361 (6th Cir. 2008) (finding that even assuming the plaintiff's lupus causes sensitivity to environmental conditions that affects her ability to work, the plaintiff failed to allege or demonstrate that her inability to work in cold or drafty environments precludes her from working a class of jobs or a broad range of jobs in various classes); Bryson v. Regis Corp., 498 F.3d 561, 576 (6th Cir. 2007) (finding that the plaintiff's ability to work was not substantially limited where "[s]he has not established that her medical condition bars her from working in all jobs within the cosmetology field, or that it prevents her from holding a large number of jobs in other categories of employment"); Olds v.

UPS, Inc., 127 F. App'x 779, 782 (6th Cir. 2005) (per curiam) (stating that the plaintiff's "lifting restriction prevents him from working as a delivery driver and from performing other jobs at UPS specifically, but there is no evidence in the record that it prevents him from engaging in a broad class of jobs"); Jasany v. United States Postal Service, 755 F.2d 1244, 1250 (6th Cir.1985) (holding that the plaintiff was not substantially limited in life activity of working where the plaintiff's eye impairment, although a permanent one which prevented him from performing functions of a postal distribution clerk, did not interfere with his ability to work other jobs). At this stage in the litigation, Damron can no longer rely on allegations alone.

As noted above, Damron also claims that her impairments substantially limit other major life activities, but fails to specify what those activities may be. It is not the charge of this Court to make Damron's case for her.[20] That responsibility lies with Damron and her attorney. Nor can this Court assume what those other life activities may be. In any case, the Court has reviewed the record and finds that Damron points to no evidence demonstrating that her impairments are severe enough to qualify as substantially limiting. Additionally, though Damron never addressed the other two definitions of disability, the Court notes that there also is no evidence that Damron had a record of[21] or was regarded[22] as having a substantially limiting

---

[20] Additionally, as stated above, the Court will not "sua sponte comb the record from the partisan perspective of an advocate for the non-moving [or moving] party." Guarino, 980 F.2d at 410.

[21] To satisfy this definition of disability, Damron would have to show that she had "a record of a physical or mental impairment which substantially limits one or more of [her] major life activities." Doe v. Salvation Army in U.S., 531 F.3d 355, 357 (6th Cir. 2008).

[22] An individual may be "regarded as" disabled if:

(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity

impairment.  Accordingly, Damron fails to show that she is "disabled" as required to meet the

first prong of the prima facie case and the Court therefore grants summary judgment to

Defendants as to Damron's Ohio law disability discrimination claims.

### C.     Section 1983 Equal Protection Claims

In addition to bringing statutory discrimination claims, Damron also sues Defendants

under 42 U.S.C. § 1983, alleging that Defendants' conduct violated the Fourteenth Amendment

of the United States Constitution in that they denied Damron equal protection of the law because

of her sex and gender and because of her disability.  Damron bases these claims on the same

factual allegations upon which she based her statutory discrimination claims.  Defendants argue

that they are entitled to summary judgment on these claims for the same reasons that they are

entitled to summary judgment on Damron's statutory discrimination claims.  In her response

brief, Damron does not specifically address either of her equal protection claims.

---

mistakenly believes that an actual, nonlimiting impairment substantially limits
one or more major life activities. In both cases, it is necessary that a covered
entity entertain misperceptions about the individual – it must believe either that
one has a substantially limiting impairment that one does not have or that one has
a substantially limiting impairment when, in fact, the impairment is not so
limiting.

Sutton, 527 U.S. at 489.  There mere fact that an employer recognizes an employee's impairment
and provides the employee with requested accommodations does not indicate that the employee
is regarded as disabled.  See Plant v. Morton Intern., Inc., 212 F.3d 929, 938 (6th Cir. 2000)
(finding that a plaintiff could not show that he was regarded as disabled through evidence that
his supervisor was aware of his medical restrictions and modified the plaintiff's responsibilities
based on those restrictions); Linser v. State of Ohio, Dep't of Mental Health, No. 99-3887, 2000
WL 1529809, at *4 (6th Cir. Oct. 6, 2000) ("The fact that [d]efendants previously granted
[plaintiff's] request for accommodation does not by itself establish that [d]efendants regarded
[plaintiff] as disabled.").

Equal protection claims based on alleged employment discrimination[23] are rare, though not unheard of, because employees typically opt to bring such claims under the relevant federal statutes adopted specifically to address such claims – in this case Title VII and the ADA. Generally, "[w]here a statute provides a particular procedure and an exclusive remedy for violations, § 1983 may not be used to obtain additional remedies. However, the fact that a statute contains a comprehensive remedial scheme does not necessarily rule out the availability of all additional remedies under § 1983." Day v. Wayne County Bd. of Auditors, 749 F.2d 1199, 1202 (6th Cir. 1984) (citation omitted). Previously, in addressing whether an employee may bring claims against his or her public employer under both Title VII or the ADA and § 1983, courts have held that the Title VII or ADA statutory schemes provide the exclusive remedy where the right sought to be vindicated is one created solely by those statutes.[24] Seen id. at 1204-05; Cole v. Taber, 587 F. Supp. 2d 856, 863 (W.D. Tenn. 2008); Vinson v. Thomas, 288 F.3d 1145, 1156 (9th Cir. 2002); Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1531 (11th Cir. 1997). By contrast, "an employee may sue his or her public employer under both Title VII and § 1983 where the employee establishes that the employer's conduct violated both Title VII and rights derived from the United States Constitution or a federal statute that existed at the time of the enactment of Title VII." Johnson v. City of Memphis, 73 F. App'x 123, 129-30 (6th Cir.

---

[23] This is particularly true with regard to equal protection claims based on disability discrimination in the employment context. The Court therefore found few cases addressing such claims.

[24] Thus, for example, courts have found that public employees may not bring claims of retaliation in violation of Title VII under § 1983, because such claims arise solely out of Title VII. See Day, 749 F.2d at 1205; Russell v. Drabik, 24 F. App'x 408, 411 (6th Cir. 2001) (finding that "to the extent that Plaintiff's [§ 1983] constructive demotion claim alleges a transfer based on retaliation, a right arising under Title VII, it is barred").

2003) (citing <u>Day</u>, 749 F.2d at 1205).  The same rule has been applied where a plaintiff brings

claims under both the ADA and § 1983.  <u>See</u> <u>Baumgardner v. County of Cook</u>, 108 F. Supp. 2d

1041, 1053 (N.D. Ill 2000); <u>Pathways Psychosocial v. Town of Leonardtown, MD</u>, 223 F. Supp.

2d 699, 708-09 (D. Md. 2002); <u>Mork v. Salt Lake County</u>, No. 2:03-CV-686 PGC, 2005 WL

3050990, at *3 (D. Utah Nov. 15, 2005) (allowing § 1983 and ADA claims based upon the same

set of facts where the plaintiff alleged both a deprivation of rights granted under or created by

the ADA and unconstitutional deprivations of his civil rights); <u>Cisneros v. Colorado</u>, No.

Civ.A.03CV02122WDMCB, 2005 WL 1719755, at *10 (D. Colo Jul. 22, 2005).

In the instant case, Damron does not base her § 1983 claims solely upon violations of

Title VII or the ADA, but rather asserts violations of her Fourteenth Amendment right to equal

protection.  The Court therefore finds that although Damron based her § 1983 and statutory

discrimination claims on the same core set of facts, her § 1983 claims are not barred.

Nonetheless, the Court finds that Damron fails to set forth sufficient evidence to survive

summary judgment as to those claims.

### 1.   Denial of Equal Protection on the Basis of Sex/Gender

In analyzing equal protection claims of this nature, courts have applied the same

framework used to analyze Title VII cases.  <u>See</u> <u>Russel</u>, 302 F. App'x at 390 ("Discrimination

under § 1983 and discrimination under Title VII are both proved through the <u>McDonnell</u>

<u>Douglas</u> framework, so the claims will be addressed together."); <u>Weberg v. Franks</u>, 229 F.3d

514, 522 (6th Cir.2000).  The Court has already determined, using that same framework, that

Damron failed to set forth sufficient evidence to survive summary judgment as to her state law

gender discrimination claim.  For the same reasons, the Court grants summary judgment to

Defendants as to Damron's claim that she was denied equal protection on the basis of her sex and/or gender.

## 2. Denial of Equal Protection on the Basis of Disability

Defendants argue that just as Damron's claim alleging denial of equal protection on the basis of sex is analyzed using the framework and case law applicable to Title VII gender discrimination claims, Damron's claim alleging denial of equal protection on the basis of disability should be analyzed using the framework applicable to ADA disability discrimination claims. Without any discussion on the matter, Damron also analyzes all of her disability discrimination claims using the same framework. Some courts have similarly analyzed ADA and § 1983 equal protection claims under the same framework. See Stofsky v. Pawling Cent. School Dist., 635 F. Supp. 2d 272, 305 (S.D.N.Y. 2009). However, other courts have held that equal protection claims alleging disability discrimination in the employment context involve different burdens of proof and are therefore analyzed differently from ADA claims. See Vike v. Coopman, No. 08-cv-486-bbc, 2009 WL 2045962, at *13-14 (W.D. Wis. July 10, 2009).

Though the Sixth Circuit has not explicitly addressed the manner in which claims such as this should be examined, but has suggested in one case that the standards applicable to Rehabilitation Act claims are also applicable when resolving claims of disability discrimination under the equal protection clause. See Timm v. Wright State University, 375 F.3d 418, 424 (6th Cir. 2004). In Timm, the plaintiff claimed that the defendant discriminated against her on the basis of disability by terminating her employment and brought claims for both a violation of the Rehabilitation Act and for a violation of her equal protection rights. Id. at 423-424. The Sixth Circuit analyzed her Rehabilitation Act claim first, and, using standards applicable to both ADA and Rehabilitation Act cases, found that the plaintiff failed to show she was "disabled" within

the meaning of the acts and therefore could not establish a prima facie case.  Id.   Then, turning

to the plaintiff's equal protection claim, the only actual standard the court articulates is that "[t]o

succeed on a § 1983 claim of this kind, against a public employer for an equal protection

violation, the plaintiff must show that the employer made an adverse employment decision with

a discriminatory intent and purpose."[25]  Id. at 424 (citing Sutherland v. Michigan Dep't of

Treasury, 344 F.3d 603, 614 (6th Cir. 2003) and Boger v. Wayne Cty., 950 F.2d 316, 324-25

(6th Cir. 1991) (quotations omitted)).  Applying that standard, the court analyzed the plaintiff's

claim as follows:

> As we stated previously, Ms. Timm presented no evidence that she actually
> suffers from a disability. Therefore, we find no merit to her argument that she is
> entitled to class-based protection. Although Ms. Timm cites Thomas v. Gee, 850
> F. Supp. 665 (S.D. Ohio 1994) and Williams v. Ohio Dep't of Mental Health, 960
> F. Supp. 1276 (S.D. Ohio 1997), to support her claim, neither case presents a set
> of facts similar to her case. Moreover, neither of these cases nor her argument
> presents any evidence to establish that Ms. Timm was discriminated against or
> was treated differently than other similarly situated non-protected employees.
> Therefore, we conclude that Ms. Timm failed to meet her burden of establishing a
> prima facie claim under the Equal Protection Clause.

Id. at 424.

Applying Timm to the facts of this case, the Court finds that Damron similarly fails to

show that she actually suffers from a "disability" as defined under the ADA and therefore is not

entitled to class-based protection.  Nor has Damron presented evidence to show that she was

treated differently from other similarly situated non-protected employees.  Damron simply fails

---

[25] Damron asserts § 1983 claims against both individual and county defendants.  In order
to succeed on a § 1983 claim against a county, Damron would have to prove not only a violation
of her equal protection rights, but also that the County had a a policy, practice, or custom,
formally or informally, that resulted in a violation of those rights.  See Monell v. Department of
Social Services of City of New York, 436 U.S. 658 (1978).  The Court need not reach that state
of analysis in this case as Damron fails to provide any evidence of an equal protection violation.

to point to any evidence demonstrating that Defendants did not hire her for those positions on the basis of her disability. The Court therefore grants summary judgment to Defendants.[26]

### D. Retaliation in Violation of Ohio Revised Code § 4112.02

In addition to raising discrimination claims, Damron alleges Defendants retaliated against her for pursuing her rights under federal and state law in violation Of Ohio Rev. Code § 4112.02. (Doc. 8 ¶¶ 64-65.) Section 4112.02(I) prohibits retaliation as follows:

> It shall be an unlawful discriminatory practice . . . [f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112 .07 of the Revised Code.

To establish a prima facie case of retaliation, Damron must demonstrate: (1) she engaged in activity protected by Ohio law; (2) the exercise of protected rights was known to Defendants; (3) Defendants thereafter took adverse employment action against her, or she was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection

---

[26] Even if this Court were to analyze Damron's claim under a more traditional equal protection standard, requiring the Court to consider whether there was any rational basis for the state action distinguishing between Damron and other individuals because of her disability. See Board of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 367 (2001) ("States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational"); Pendleton v. Jefferson Local School Dist. Bd. of Educ., No. 91-3126, 1992 WL 57421, at *8 (6th Cir. 1992) (finding that rational basis review applies to claims that an individual was denied equal protection on the basis of handicap); Yates ex rel. Estate of Yates v. Beck, No. 1:03CV10-T, 2003 WL 22231260, at *5 (W.D.N.C. Aug. 22, 2003). The defendant does "not need to articulate its reasoning when the decision is made. The burden is upon the challenging party to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification." Discovery House, Inc. v. Consolidated City of Indianapolis, 319 F.3d 277, 282 (7th Cir. 2003). In this case, Damron fails to set forth any facts suggesting that Defendants lacked any rational basis for deciding not to place her in the various positions to which she applied.

between the protected activity and the adverse employment action or harassment.  Garner v. Cuyahoga County Juvenile Court, 554 F.3d 624 (6th Cir.  2009); Lindsay v. Children's Hosp. Med. Ctr. of Akron, No. 24114, 2009 WL 692129, at *3 (Ohio App.  Mar. 18, 2009).

Damron's claim fails because she sets forth no evidence that she engaged in any protected activity.  In her response brief, Damron claims that she asserted her right to be free from discrimination through the grievance that she filed after not being selected for the full time screener position in 2007.  However, the only evidence having to do with that grievance that was submitted to the Court shows that the grievance was based on an alleged violation of policy with regard to seniority.  There is no evidence that the grievance had anything to do with disability or gender discrimination or harassment, or that it involved any allegation that Defendants were not providing Damron with proper accommodations.  Accordingly, the grievance record does not serve as evidence that Damron engaged in activity protected under Ohio Revised Code Chapter 4112.  See Canady v. Rekau & Rekau, Inc., No. 09AP-32, 2009 WL 3021764, at *10 (Ohio App. Sept. 22, 2009) (finding that the complaints that the plaintiff made to his employer did not amount to protected activity because complaints did not contain any allegation of racial discrimination).  Additionally, even if Damron had provided evidence demonstrating that the grievance she filed constitutes engaging in a protected activity, there is no evidence of a causal connection between the filing of the grievance and any adverse employment action.[27]

_____

[27] With regard to the causal connection requirement:

[A] plaintiff must produce evidence which permits the inference that apart from the protected activity, the adverse action would not have been taken.  This determination is made with reference to the surrounding circumstances, including evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights.  Standing alone, however, temporal proximity does not

Defendants also point out the Damron's First Amended Complaint can be read to assert a claim that Defendants retaliated against her for filing a workers' compensation claim in violation of Ohio Rev. Code § 4123.90. Defendants argue that any such claim fails as a matter of law because Damron failed to comply with the necessary procedural requirements of § 4123.90.[28] To the extent Damron intended to assert such a claim, she waived it by failing to either mention or address any violation of § 4123.90 in her response brief.

**E.      Negligent and Intentional Infliction of Emotional Distress**

Damron next asserts claims for negligent and intentional infliction of emotional distress. Defendants argue that under Ohio law, they are entitled to immunity from such claims. Defendants also argue that Damron's negligent infliction of emotional distress claim is not cognizable under Ohio law. In her response brief, Damron cites much of the same evidence previously discussed. She completely ignores Defendants' arguments regarding state statutory

---

establish the requisite connection, and this is particularly true when the evidence demonstrates intervening performance concerns.

Price v. Matco Tools, No. 23583, 2007 WL 2810006, at *9 (Ohio App. Sept. 27, 2007).

[28] Pursuant to Ohio Rev. Code § 4123.90: "No employer shall discharge, demote, reassign, or take any punitive action against any employee because the employee filed a claim . . . under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of [her] employment with that employer." If an employer retaliates against an employee for filing a workers' compensation claim, then the employee may file an action against the employer. Id. However:

The action shall be forever barred unless filed within one hundred eighty days immediately following the discharge, demotion, reassignment, or punitive action taken, and no action may be instituted or maintained unless the employer has received written notice of a claimed violation of this paragraph within the ninety days immediately following the discharge, demotion, reassignment, or punitive action taken.

Id.

immunity and cites the Court to no law in support of her claims. She does not even address the basic legal standard for such claims.

The Court turns first to Damron's negligent infliction of emotional distress claim. That claim fails as a matter of law because "Ohio courts do not recognize a separate tort for negligent infliction of emotional distress in the employment context. Generally, recoveries in actions for this form of emotional distress have been restricted to very limited situations, namely situations involving automobile accidents." Tschantz v. Ferguson, 97 Ohio App. 3d 693, 714, 647 N.E.2d 507, 521 (Ohio App. 1994) (citations omitted); see also Bruce v. Office Depot, Inc., No. 3:03CV464, 2005 WL 1620399, at *3 (S.D. Ohio Jul. 5, 2005); Wright v. Schwebel Baking Co., No. 04-MA-62, 2005 WL 2065124, at *5 (Ohio App. Aug. 29, 2005).

The Court next finds that there are no genuine issues of material fact as to Damron's intentional infliction of emotional distress (hereinafter "IIED") claim. As such, the Court need not determine whether Defendants are entitled to statutory immunity. In order to prevail on an IIED claim, a plaintiff must prove: (1) that the defendant either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; (2) that the defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) that the defendant's actions were the proximate cause of plaintiff's injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable man could be expected to endure it. Tschantz, 97 Ohio App. 3d at 702, 647 N.E.2d at 513. With regard to the conduct necessary to make out such a claim, the Supreme Court of Ohio stated as follows:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Yeager v. Local Union 20, 6 Ohio St. 3d 369, 375, 453 N.E.2d 666, 671-72 (1983).

In support of her IIED claim, Damron first argues that she suffered "a great deal of distress due to the actions of all defendants, including, but not limited to the two level demotion, before forced to undergo three separate fitness for duty evaluations, being investigated for many different unfounded matters, and being terminated." (Doc. 31 at 22.) There is absolutely no evidence, however, that Damron was demoted, terminated, investigated for anything, or forced to undergo any more than one fitness for duty evaluation. Because it appears as though Damron is referring to an altogether different set of facts, the Court surmises that the quoted portion of Damron's brief was lifted from another brief and not properly tailored to the facts of this case.

Damron next claims that Defendants intentionally caused her distress by making "gestures and statements to and about" her and points directly to the statement allegedly made by Lang that "if [she]couldn't do [her] job, perhaps [she] needed to find something else to do and that [Lang] felt they had made enough accommodations for [her]." (Damron Dep. 226:19-24.) Damron also alleges that the Defendant acts of making her perform field work after her return from maternity leave constituted extreme and outrageous behavior.

The Court however, finds that no reasonable jury would find the acts described by Damron to be so extreme and outrageous as to go beyond all possible bounds of decency. First,

with regard to the field work, the undisputed evidence shows that upon Damron's return from maternity leave, she was only required to do field for a short period of time and was always accompanied by another employee. As soon as Damron presented a letter from Dr. Butcher indicating that she should only be sent out on limited types of field visits, BCCS complied with the requested accommodations. Then, approximately two months later, when Dr. Hellmann recommended that Damron not perform any field work, BCCS ceased sending Damron out on field visits and found positions for her within BCCS that would not require any field work.

Nor are the alleges gestures and comments of Defendants, including the comment Lang is alleged to have made, so extreme and outrageous as to form the basis of an IIED claim. See Davis v. Johnson, No. 07 CA 40, 2007 WL 4293308, at *5 (Ohio App. Dec. 7, 2007) ("The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities . . .. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam." (quotation marks omitted)); Stembridge v. Summit Academy Mgt., No. 23083, 2006 WL 2270855, at *8 (Ohio App. Aug. 9, 2006) (finding as a matter of law that the conduct alleged to support the plaintiff's IIED claim was not outrageous where the evidence consisted of the plaintiff's uncorroborated deposition testimony that his boss fired him in front of sixteen coworkers and mocked him about being blind); Rice v. Cuyahoga County Dept. of Justice, No. 85576, 2005 WL 2467058, at *10 (Ohio App. Oct. 6, 2005) (holding that the following actions of an interim director and department manager did not amount to extreme and outrageous behavior in the employment context: creating untrue accusations against the plaintiff, being aggressive, refusing to speak to the plaintiff, looking the other way when the plaintiff walked by, and being disrespectful).

Finally, Damron presents no evidence that the alleged acts of Defendants caused her the type of severe and debilitating emotional distress that must be shown to prevail on an IIED claim. Alam v. Chemstress Consultant Co., No. 22175, 2005 WL 156722, at *2 (Ohio App. Jan. 26, 2005) ("Emotional distress suffered by a party must be both severe and debilitating to recover damages under an intentional infliction of emotional distress claim.").

F. **Failure to Provide a Safe Work Place Under Ohio Rev. Code § 4167.04**

Damron's last claim is that Defendants failed to provide a safe work environment in violation of Ohio Rev. Code § 4167.04 by forcing her to go to Moore's without proper safeguards. Defendants argue they are entitled to summary judgment on this claim because Ohio Rev. Code § 4167.13 provides the sole and exclusive remedy for violations of Chapter 4167.

"Ohio enacted the Public Employment Risk Reduction Program (PERRA), codified in [] Chapter 4167, as the counterpart to the federal Occupational Safety and Health Act (OSHA)." Baldwin's Ohio Practice, Local Government Law–Municipal, Oh. Mun. L. § 11:48 (2009). Chapter 4167, titled "Public Employment Risk Reduction," regulates the occupational safety and health of workers in Ohio's public sector. Section 4167.04 generally requires every public employer in Ohio (1) to furnish employment and a place of employment free from recognized hazards causing or likely to cause death or serious harm to employees and (2) to comply with all Ohio employment risk reduction standards, rules, and orders promulgated under Chapter 4167. Section 4167.02 empowers the Ohio Bureau of Employment Services to enforce Chapter 4167.

Chapter 4167 provides several enforcement mechanisms to ensure compliance. For example, § 4167.10(A) gives the administrator of workers' compensation or the administrator's designee the authority to conduct workplace inspections, issue citations, and issue abatement orders. Section 4167.10 also creates a mechanism by which an employee may request an

inspection.  See Ohio Rev. Code § 4167.10(B).  Section 4167.14 authorizes the administrator or the administrator's designee to seek injunctive relief in the face of imminent danger.

Section 4167.13(A) provides that "[n]o public employer shall discharge or in any manner discriminate against any public employee because the public employee, in good faith, files any complaint or institutes any proceeding under or related to this chapter, or testifies or is about to testify in any proceeding, or because of the exercise by the public employee, on his own behalf or on the behalf of others, of any right afforded under this chapter."  In order to enforce § 4167.13(A), § 4167.13(B) creates a scheme that allows employees believing they have been discharged or otherwise discriminated against in violation of subsection (A) to pursue certain enumerated remedies.

Neither of those mechanisms apply in the instant case.  Damron did not seek an inspection of her workplace nor does she claim that Defendants retaliated against her for filing a complaint or instituting any proceeding under or related to Chapter 4167.  Instead, Damron simply argues that Defendants failed to comply with the requirements set forth in § 4167.04. Chapter 4167 does not authorize such a claim and this Court could not find a single case in which such a claim was recognized.  See, e.g., Anderson v. Ruoff,  100 Ohio App.3d 601, 605, 654 N.E.2d 449, 452 (Ohio App. 1995) (noting that "OSHA standards relate only to employers and do not provide a private cause of action for third parties").  Accordingly, Defendants are entitled to summary judgment as to Damron's claim under Ohio Rev. Code § 4167.04.

## IV.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants Motion for Summary

Judgment.

IT IS SO ORDERED.


                                               ____s/Susan J. Dlott_____
                                              Chief Judge Susan J. Dlott
                                              United States District Court